NANETTE SEXTON RICHMAN *vs.* HERBERT J. RICHMAN.

No. 89-P-73.

Norfolk. February 16, 1990. - June 6, 1990.

Present: DREBEN, CUTTER, & SMITH, JJ.

*Divorce and Separation*, Division of property, Alimony. *Judge. Contempt.*

In a divorce proceeding, no error appeared in the judge's allocation of marital property under G. L. c. 208, § 34. [662-664]

In a divorce action in which no permanent alimony to the wife was allowed, in which the judgment nisi did not take into account the husband's failure to pay support as ordered prior to the judgments and in which payments to the wife of money pursuant to the division of marital property under G. L. c. 208, § 34, were stayed pending the parties' appeals, the matter was remanded for the probate judge's reconsideration of the issue of interim alimony payments to the wife. [664-665]

COMPLAINTS for divorce filed in the Norfolk Division of the Probate and Family Court Department on December 29, 1986, and January 30, 1987, respectively.

The cases were heard by *Edward M. Ginsburg*, J.

*Jacob M. Atwood* for Nanette Sexton Richman.

*Monroe L. Inker* (*Robert J. O'Regan* with him) for Herbert J. Richman.

CUTTER, J. This divorce proceeding is closely related to *Apostolicas Properties Corp.* v. *Richman, post* 671 (1990), and has been decided by the same panel of this court.

A. *Procedural Background*

Nanette Richman (the wife) brought this divorce proceeding in the Norfolk County Probate Court on December 29, 1986, by a complaint alleging cruel and abusive treatment and adultery. This complaint was amended on February 23, 1988, during the trial, at the suggestion of the presiding judge, to assert the ground of irretrievable breakdown of the

marriage upon which the judgments nisi were granted on March 4, 1988.[1] Richman (the husband) filed a cross complaint alleging cruel and abusive treatment, amended in similar fashion on the husband's motion allowed February 5, 1988. There was a period in 1987 and early 1988 of pretrial discovery, cross motions, and various controversies of counsel, all supervised by a special master. He was designated by the probate judge assigned to hear the case to avoid the undue use of his own time as counsel "squabbled over the proper scope of discovery." The litigation culminated in ten court days of trial (February 3-23, 1988).

The principal issues on these appeals relate to the denial by the judge of any continuing alimony to the wife and to his division of marital property (pursuant to G. L. c. 208, § 34) on the basis of his findings. Other issues are dealt with in the appendix to this opinion. The principal issues, however, appear to be the predominant area of acrimonious disputation in what has become in the words of the probate judge "an exceedingly ugly court fight."[2] The judge's findings, necessarily very much condensed,[3] supplemented by some items

[1]The charge of adultery in the wife's complaint was dismissed on February 22, 1988, when the judge stated, "On the law as I see it, although I am not naive, I don't think there has been a proof of adultery." Supplemental Probate Court Rules 404 and 405 require certain actions to be taken prior to charging any person with adultery in a divorce proceeding. No action by the wife's attorney at any time pursuant to these rules has come to our attention. See discussion in par. A. 2 in the appendix to this opinion.

[2]This proceeding, the judge obviously thought, had been greatly complicated by the bitter antagonism of the counsel of each party going back over many years, as well as by the hostile behavior of the parties to each other and by what the judge, with restraint, refers to as the "lack of candor . . . of both parties."

[3]The record in this case is of extraordinary length for a divorce matter where there exists no need for funds for the support and education of minor children of the marriage. Together with the record in the closely related case of *Apostolicas Properties Corp.* v. *Richman, post* 671 (1990), the formal record covers over 2,600 pages. The formal briefs in the two cases come to over 260 pages. The papers in connection with our remand to the probate judge for clarification of his findings, his response, and the comments of counsel on that response are not reproduced in any printed record and are not included in the above figures. This case obviously (in

from the evidence, deal with the following matters among others.

### B. *The Findings and the Record Concerning the Marriage*

The wife and husband, after some months of living and traveling together, were married on June 23, 1979. No children were born of this marriage. The wife, at the 1988 trial in her middle forties, had been married once before. She has had no children by either marriage. The husband, in his fifties, had been married twice before and has two adult children.

The husband is a senior executive and a director of a large corporation. He has or has had annual income from salary, bonuses, stock dividends, interest, and capital gains of about $732,000. This figure does not include the exercise of stock options or income in the form of debt forgiveness by his employer corporation. Such items have accounted for taxable income to the husband of several million dollars from 1984 to the date of trial. Before the 1979 marriage, the husband had already participated in founding the company of which he is an officer and in arranging for stock purchase options, loan cancellations or withdrawals, and similar benefits. His 1979 net worth was over $11,000,000.

The wife currently lives in Florida, where she is operating a horse training and horse brokerage business, started during the marriage as set out later in this opinion. Before the marriage, the wife was a graduate student at Harvard, working toward a Ph.D. in fine arts. She was earning about $100 per week as a teaching fellow at Massachusetts Institute of Technology when she met the husband and, during the year before they married, she earned $60,000 as a photographer. This occupation, because of her affliction with Raynaud's disease (discussed below), she cannot now resume. She had $16,000 in a bank account, an automobile, and a collection of works by the artist Alexander Calder, her great uncle. During the marriage, the husband (through contacts by the

terms of consumption of trial and appellate court judges' time) has not resulted in economical judicial administration.

wife with her relatives) purchased another Calder painting ("Circus") for the wife's collection for $10,000 and paid an additional $6,000 for its restoration.

The wife was diagnosed in 1982 as suffering from Raynaud's disease, a condition which results in constriction of the arteries in the hands and feet. The results are swelling and discoloration of the extremities, loss of dexterity, and skin ulcerations.[4] The husband is in good health and has no disability. "It appears that the wife is employable . . . as a trainer and importer of horses." She has in varying degrees other possible vocational skills (obtained with encouragement of the husband and in part paid for by him) in the areas of fine arts, design, and broadcasting.

During their marriage, the couple enjoyed a lavish lifestyle. They had several places of abode, including one on Beacon Hill, Boston. They also owned, at different times, farms in New Hampshire, one in Hollis, and later a sixty-acre estate in Dover, Massachusetts, which cost $3,000,000, with a $600,000 riding ring added later. Hired employees or servants took care of at least some of the husband's and wife's daily domestic and farm needs. The parties' station in life was that of very wealthy persons. The wife, "[f]rom the very modest life-style of a teaching fellow prior to the marriage . . . ha[d] been catapulted to a standard of living which very few have ever seen, let alone enjoy[ed]."

The husband contributed large financial resources to the marriage. The husband also provided emotional and some financial support to the wife in her attempts to take her Ph.D. degree at Harvard and in some later formal instruction in the fields of design and broadcasting. She "has had a virtually

[4]Although there is no known cure, the wife's condition is being treated with medication. The judge, who heard and observed all the witnesses, found that the wife's testimony about the severity of her affliction lacked credibility. The wife also has a heart condition known as a mitral valve prolapse, but her physician has not detected any irregularities of her heart rhythm. The wife's medical situation has not prevented her from engaging in demanding physical work in connection with her horse business. See par. A. 4 of the appendix to this opinion.

unlimited expense account including over twenty . . . charge accounts at all of the nationally named stores."

The wife "took over . . . a horse farm, . . . run as a business for tax purposes but . . . really a hobby. . . . [The husband] received the benefit of tax write-offs for the . . . losses." She gained "the opportunity to indulge herself in the lavish style of the horse set. . . . When she departed for Florida in December of 1987, she left with an entourage consisting of a trainer, two . . . grooms, a stable boy, and seven . . . horses. Her current [annual] payroll [which she wants her husband to support as part of her alimony claim] is over" $20,000.

The wife's contributions to the husband were, the judge found, "more subtle and harder to define. She ha[d] not contributed financially. She ha[d] not performed [and the husband did not expect her to perform] the home making services traditional to most marriages," as most of those services (as already stated) were performed by hired employees. "The husband was away from home about a third of the time on business. . . . What she contributed to him was a certain mark of distinction or style. Her Calder art decorated the Boston townhouse. When he brought potential executive recruits to the house for an interview, she was charming and hospitable." Her own testimony suggested that she dealt in a helpful manner with the husband's adult children. The wife "obviously enjoyed the benefits and position which . . . [the husband's] money could provide."

The parties last lived together as husband and wife on December 24, 1986. The breakdown of the marriage probably began much earlier, however, as the wife by March, 1985, quietly had retained her divorce attorney (ostensibly to draw her a will, a document not shown then to have been drawn) and "through him [her divorce attorney] retained a detective to follow her husband." She admitted that thereafter, while still living with her husband, even after an alleged episode which she later described as "rape," she sent her divorce counsel copies of papers of the husband found by her which she thought might be of importance. The judge reasonably

viewed theirs as a short term marriage and concluded that if "there ever was a meaningful partnership in this marriage, the relationship has degenerated" and the "marriage has suffered an irretrievable breakdown."

Early in the relationship each had been given reason to be suspicious of the other. The judge recounted a series of episodes which caused him to doubt the credibility of each spouse, and the fairness of their dealings with each other.[5] The judge expressly found that "the conduct of both parties gave cause to undermine the confidence of the other in the relationship."

The probate judge recognized that a major question presented to him was "What obligation does the husband have to sustain . . . [the] wife at the standard of living to which she has become accustomed?" At a pretrial conference, probably partly to bring the parties to consider settlement of their problems, and "[b]ecause of the uniqueness of the factual situation," the judge recommended that counsel themselves "select a panel of three . . . [divorce law] experts and make [to them] both a written and oral presentation in the nature of an offer of proof in order to see what guidance the panel could provide."[6]

---

[5]There is no occasion to review in detail all the incidents mentioned by the judge in which one or the other of the spouses acted without appropriate concern for the substantive interests and feelings of the other. One such episode dealt with the husband's actions in the sale of the farm in Hollis, New Hampshire. The husband could be found on the evidence unjustifiably to have directed his secretary to sign the wife's name on the deed and to obtain a false notarial acknowledgement of it. This matter is the subject of the related case, *Apostolicas Properties Corp.* v. *Richman, post* 671 (1990).

[6]The judge's description of the panel proposal continued: "Because of the extreme animosity between counsel and . . . to protect the panel from being buffeted, the . . . [judge] received permission of both counsel to preside over the presentation to the panel and its report. Counsel agreed that the presence of the . . . [judge] would not be a basis for future disqualification. The . . . [judge] made it clear that . . . [he] would have an open mind to hear the case on the merits, if the recommendation of the panel did not produce a settlement. In view of the fact that the panel's recommendation [made without the judge's participation in their deliberations] was considerably less than the husband had . . . offered," no settlement took place after the presentation to the panel.

The judge showed in his extensive findings great familiarity with all the proceedings and the evidence. He accepted essentially the evidence that the husband had gross assets at the time of trial of at least twenty-five or twenty-six million dollars and a "net worth" (after asserted debt obligations of about ten million dollars) of over fifteen million dollars, and that the "foundation for his wealth was established long before he met . . . the wife and [that] she played no significant role in the increase of his wealth . . . [after] the marriage."

The judge found that the husband has a "practically unlimited opportunity for the future acquisition of capital assets and income," and that the wife (in the light of the award of $1,000,000 to her [discussed below] and her possession of her Calder art items, her education and demonstrated skills) has a "reasonable opportunity for future acquisition of capital assets and income." He further found that "[d]uring the marriage, the wife's needs were defined by the husband's willingness . . . [financially] to . . . support her interests." The judge concluded that "[i]n view of the length of the marriage, the age of the parties, and all of the factors under . . . [G. L. c. 208, § 34], the wife is not entitled to be maintained on a permanent basis at the standard of living which she enjoyed while with the husband. . . . The wife is entitled to a sufficient assignment of assets which will allow her to readjust to a reasonable standard of living and . . . to stake herself in her new proposed venture as she sees fit."

The probate judge allocated the assets, purporting to have considered "all of the factors under . . . G. L. c. 208, § 34, and the relevant tax considerations." He awarded to each party the property already comprising their respective estates, as described to him, except that the husband was or-. dered to pay the wife in two equal cash installments the aggregate sum of $1,000,000. He awarded the wife no continuing alimony.[7] These provisions were incorporated ap-

---

[7]The judge set forth his reason for this in part: (a) "[T]he acrimony between the parties" makes undesirable "an ongoing relationship" which "is bound to lead to future litigation." (b) "The concept of rehabilitative

propriately in the judgments nisi from which the present appeals have been taken.

At the arguments of the present appeal and in his briefs for her, the wife's attorney contended that the probate judge, in effect, had taken the view at various stages of the divorce proceedings that the large size of the husband's assets was not significantly material in deciding what the wife was entitled to receive under c. 208, § 34. The appeal panel, on this account, remanded the case (six days after the arguments) to the probate judge to make certain that he had given full consideration to *all* the criteria which, under c. 208, § 34, he was required to take into account. The judge made a very prompt response (dated February 27, 1990) to our remand inquiry, essentially explaining and reaffirming positions which he had taken in his original findings.[8]

### C. *Discussion of the Judge's Decision on Alimony and Allocation of Marital Assets*

In deciding, in connection with a divorce, what if any alimony will be awarded to one spouse and what should be the

---

alimony makes no sense in the context of this case. The wife has her skills." (c) To ask the husband "to underwrite the development of her [horse] business in Florida is unfair." That is "her business speculation." (d) With the million dollar cash payment to her under c. 208, § 34, she "is in a position to readjust her life without suffering . . . an . . . [undue depression] in life-style." The judge then made the following comment: "The amount of money given to the wife will not thrust her back into the modest circumstances which she had prior to the marriage. She will have a net worth of close to two million . . . dollars [after unsecured obligations in the aggregate of about $250,000 to "two benefactors . . . primarily used for lawyer's fees" and other litigation costs]. The cash she receives . . . will insure to her the opportunity to live comfortably, albeit not at the lavish life-style she enjoyed during the marriage. If she chooses to use all or part of her funds to capitalize her horse trading business, that is her right." Of course, the wife's net worth thus found by the judge depended in large degree on the value of her Calder art objects. The judge indicated that he believed the testimony of an expert witness called by the husband, placing the value of the total Calder collection at $750,000 at the time of the trial, but without placing any value on it as of the 1979 marriage.

[8]No settlement resulted from the remand. The most significant passages in the probate judge's response were perhaps in the final two sentences of

equitable division of marital property under c. 208, § 34, no judicial precedent is likely completely to state the considerations which a probate judge may and should take into account and weigh on the facts of any particular case. This is especially true in the present highly unusual case. The judge appropriately held three aspects of this marriage to be of primary significance, (1) that the dissolving relationship was a childless, "short term" marriage; see and compare *Goldman v. Goldman, ante* 603, 604-608 (1990); (2) that the husband owned the great bulk of his assets before the marriage; and (3) that any increases in the value of those assets during the short marriage were not because of the wife's efforts but in major part were the result of inflation.

As in *Fechtor v. Fechtor*, 26 Mass. App. Ct. 859, 861 (1989), "[r]eview of the judge's findings [and of his response to our remand] discloses conscientious consideration of [all] those factors prescribed in G. L. c. 208, § 34." The judge in the present case by his whole decision (unlike *Bowring v. Reid*, 399 Mass. 265 [1987], where it was necessary to remand the case to the probate judge to explain his reasoning), has made apparent the reasons for his conclusions.[9]

In *Bacon v. Bacon*, 26 Mass. App. Ct. 117, 121 (1988), this court dealt with the division of property ordered by the trial judge, stating that the division showed "that the [trial] judge sought to make an equitable, rather than an equal, division . . . based on the judge's appraisal of contributions, entitlements, and realistic needs." The wife in that case had assets (*id.* at 117-118) of over $3,000,000 and her interest in the equity of the jointly owned marital home, then over

---

the next to last paragraph of the response: "Both parties have had a full opportunity to be heard. These proceedings need to be brought to a close." At the request of the wife's counsel, we gave opportunity to each party to comment on the judge's response.

[9]The *Fechtor* case was one in which much more limited assets than in the present case were involved and where both spouses during the marriage together played "active roles . . . in their domestic and business lives." Moreover, the marriage in the *Fechtor* case (id. at 860-861), had lasted over twenty years from 1963 to 1984, and there had been three children of the marriage, one still a minor at the time of divorce.

$865,000. The husband was employed by a university in an administrative position without tenure. During a twelve-year marriage the husband's standard of living had been considerably higher than it would have been, if it had not been for the wife's assets and income, largely resulting from inheritances from her father. "The husband played little role in the appreciation of [the wife's] assets" which was largely due [as in the present case] to inflation. *Id.* at 119. A limited award of marital assets was made to the husband, in the circumstances. It was stated, "It cannot be said that the husband will be able to live in totally the same way on his present assets as he did" during the marriage. "That the marital estate, however, is rationally susceptible of a different allocation does not mean that the judge has abused his discretion, which under the decisions interpreting § 34 is quite broad,[10] even if it is not limitless."[11] *Id.* at 122.

### D. *Remand Relating to Interim Alimony*

The wife contends that the probate judge improperly denied her an allowance for *permanent* alimony. The judge's action denied such an allowance, because in effect he treated it as a part of his distribution scheme under c. 208, § 34. In two respects, we remand the issue of interim alimony to the probate judge for consideration.

---

[10]It was noted in the *Bacon* case (26 Mass. App. Ct. at 122) that "the avenue of alimony [none was allowed to him] is not irrevocably closed to the husband should an adverse material change in his circumstances occur." Insufficient parallels were found between the *Bacon* case and *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811 (1985), to set aside the *Bacon* case award.

[11]The wife's counsel in the present case pointed out that his theory of the present case was "more like community property." The judge promptly and correctly told counsel that Massachusetts is not a community property State and that § 34 does not make it one. See as to this, *Davidson* v. *Davidson*, 19 Mass. App. Ct. 364, 368-377 (1985), which contains a comprehensive collection of relevant authorities. Of course in a case where there have been during a long term marriage substantially equal contributions by the spouses to what has been a true marriage partnership, the results under § 34 may have similarity to the results which would occur in a community property State.

(1) In the judgments nisi no appropriate reservation (see *Ross* v. *Ross*, 385 Mass. 30, 39-40 [1982]) was included of authority in the Probate Court to enforce the payment of arrearages in payments which should have been made prior to the judgments nisi but which had not been paid.

(2) The present appeals from the judgments nisi, which in respect of § 34 *money* payments to the wife have been stayed by court order, have consumed the time between March 4, 1988, and the date when the rescript on the present appeals is sent to the Probate Court. The probate judge entered on April 13, 1988, an order for temporary alimony to be paid to the wife from April 15, 1988, until the further order of this court at the rate of $5,000 a month. The judge may well have considered that, to the extent that the payments under this temporary order did not suffice, the § 34 payment by the husband of $1,000,000 to the wife would have enabled her (a) to support herself without significant resort to her own assets (especially the Calder art assets) and (b) to place in her horse training and brokerage business enough capital to permit her to conduct it and to maintain whatever momentum (if any) it had achieved in early March, 1988. The stays of the § 34 *money* payments may have caused injury to the wife not contemplated by the probate judge in his § 34 division of property.

On these two issues (which may be heard by the probate trial judge) we remand to the Probate and Family Court the question whether the judgments nisi (or the order of April 13, 1988) should be amended to provide for suitable additional *interim* (but not permanent) alimony.[12] In determining

---

[12]The disposition of the first item above listed in part D above, makes unnecessary further consideration of the husband's appeals from the contempt orders entered on March 30 and June 1, 1988. We think it likely that, in view of those orders as to the sum of $18,482.60, the judge will allow that sum as a part of any interim alimony awarded to the wife with a suitable allowance for the interest which would have been earned on that sum if paid promptly. In the appendix (immediately following) we discuss issues involving largely procedural aspects of the case, in which we observe no error requiring reversal as to issues dealt with by the judge, except as to the limited matter of interim alimony just made the subject of remand.

the amount, if any, of additional temporary alimony to be paid, the judge, of course, shall take into consideration the amount directed to be paid under his order of April 13, 1988.

## E. *Conclusion*

The judgments nisi of divorce, apart from the remand of the issues as to interim alimony, are affirmed. The denial of the wife's motions for a new trial is affirmed. The case is to be dealt with in all respects otherwise in a manner consistent with this opinion. As indicated in note 12, in view of the remand order in part D of this opinion, it is not necessary to deal with the husband's appeal from the contempt order of June 1, 1988. Principally because of the husband's conduct (see note 5, *supra,* and his failing to prevent the Atchley contempt, par. A. 2 of the appendix), the wife is to have costs of this appeal, but there shall be no award of counsel fees based on this appeal. The probate judge, however, may award any counsel fees with respect to the contempt orders in accordance with the fourth paragraph of G. L. c. 215, § 34A, as inserted by St. 1982, c. 282.

*So ordered.*

### APPENDIX.

The following matters argued or discussed by counsel are dealt with in this appendix.

#### A. 1. *Venue and Motions to Require Recusal*

The wife's counsel argues that the probate judge abused his discretion by refusing to recuse himself on the wife's motion. The wife undoubtedly preserved for appellate review so much of her first motion (and attached exhibits) to remand the case to Norfolk County as amounted to a motion to the judge to recuse himself, and her similar motion dated January 7, 1987, denied by the judge on January 13, 1988. The wife sought an interlocutory review by a single justice of this court which was denied by him without a hearing on February 2, 1988, stating that the wife's papers demonstrated no basis which would warrant the relief sought, if an interlocutory appeal to a panel then should be permitted by him. The single justice also stated that the issue of recusal "may be raised in connection with any appeal from the final judgment."

If it is now contended as part of the argument on the denial of the wife's motions listed in the preceding paragraph (see wife's brief, at 4-5, 20-23) that the venue of the proceedings was improperly transferred from Norfolk County to Middlesex County, that objection would not seem to have been preserved adequately in the Probate Court. By order (April 9, 1987), the Administrative Justice of the Probate and Family Court Department (1) assigned this Norfolk County matter to this probate judge (then sitting temporarily in Norfolk County) who presided at trial and (2) directed that the matter should be heard at Concord (in Middlesex County). This seems to be sufficiently consistent with *Pinkowitz* v. *Edinburg*, 22 Mass. App. Ct. 180, 186 (1986), to permit us to refrain from dealing with the issue in the absence of more timely, explicit, and sustained objection in the trial court to the order on the ground of improper venue and in the light of continued acquiescence of the parties in proceeding in Concord under the order. See also the considerations of economical judicial administration discussed in note 3, *supra*, of this opinion.

The whole record demonstrates that the presiding probate judge was able to "give an impartial and fair hearing to all parties concerned," as he certified over his signature on January 13, 1988. He would have been much wiser to have refrained from unnecessarily discussing his tentative views on the case as he did at hearings and otherwise. His participation in settlement efforts also well could have been more restrained. Nevertheless (even though each member of this panel might have decided one or more issues on the merits somewhat differently), that is not a basis for substituting our views for his exercise of the discretion which is given to him by § 34. We perceive in the record no sufficient basis for *requiring* him to recuse himself or for questioning his judicial independence as some parts of the motion to recuse essentially do.

Even if the probate judge "overexercised a trial judge's privilege of placing pressure on parties to settle" (see *Slaughter* v. *McVey*, 20 Mass. App. Ct. 768, 770 [1985]), he did not produce a settlement. Thus no consensual arrangement now is presented for revision. As a practical matter, the judge hardly could have failed to learn of the contentions made to the informal panel (chosen by and convened with the consent of the parties) or of the panel's recommendations. He did not adopt these recommendations and made an award somewhat more favorable to the wife.

The unusual circumstances differ materially from those where a prosecution for a criminal contempt in a family support situation put the judge essentially in the position of having to serve both as judge and prosecutor. Contrast *Furtado* v. *Furtado*, 380 Mass. 137, 151-152 (1980), which reversed the conviction there involved "because of the apparent unfairness of . . . [that] proceeding." We conclude, on the whole record, that this judge properly remained in the case and may continue to do so. See *Beninati* v. *Beninati*, 18 Mass. App. Ct. 529, 530-532 (1984); *Griffith* v. *Griffith*, 24 Mass. App. Ct. 943, 945 (1987).

### A. 2. *The Atchley Contempt*

In April, 1987, a summons was issued by counsel for the wife to obtain the deposition of one Robin Atchley. It was then represented by motion for a bench warrant that Atchley had not appeared and that there had been extensive efforts to obtain her presence. On August 17, 1987, the trial probate judge ordered a bench warrant to issue forthwith. At the opening of trial on February 5, 1988, the wife's counsel renewed his request for a bench warrant when Atchley did not appear. He did not ask then for a continuance, however, to obtain Atchley's testimony but immediately called the wife as a witness.

The wife in her original brief (at 57) asserts that "[o]nly the collusion of the [h]usband and . . . Atchley to deprive . . . [the wife] of the material evidence prevented her from being able to prove her allegation and obtain a divorce on the grounds of adultery," citing *Davisson* v. *Davisson*, 12 Mass. App. Ct. 420 (1981). There, however, this court (at 424-425) did not reopen the case to reconsider the disposition "on the issues of custody, alimony, and equitable division," but merely said that these matters had been dealt with already "well within range of the unremarkable," and added, "Ordinarily matters such as custody, support, and alimony are not affected by such general considerations as the relative moral rectitude of the spouses or which spouse is awarded the divorce." See the discussion in *Singer* v. *Singer*, 8 Mass. App. Ct. 113, 118-122 (1979).

This judge showed by his original findings that he doubted the husband's testimony as to his behavior on at least one occasion which suggested an extra-marital affair and was fully aware that Atchley (described in the findings as the husband's "alleged girlfriend") had avoided a bench warrant. At the hearing (March 30, 1988) on the contempt proceeding brought against Atchley and also on the wife's motions for a new trial, the probate judge commented: "The . . . areas in which . . . [Atchley's] testimony would be offered have already been considered . . . in arriving at . . . [the basic] judgment [under § 34]. . . . The . . . [judge] has . . . made findings with respect to the conduct of . . . [the husband] and the reasonable suspicions that . . . [the wife] may have had with respect to his fidelity. Any further testimony in this area would be redundant." This view was also dealt with in about the same language in the judge's order of March 30, 1988, by which he directed Robin Atchley to pay to the wife's counsel $1,485.75, the amount of expense incurred in pressing for a bench warrant and caused by her failure to obey the subpoenas served on her. He also directed her to perform stated community service. By the same order he then denied the wife's motions for relief from judgment and for a new trial.

### A. 3. *The Contempt Order of June 1, 1988, Against the Husband*

The husband now contends (see his brief with respect to the contempt order, bound with his original brief, at 5-6), that, even if prior to March

30, 1988, there had been a valid interlocutory order for the payment of $18,482.60 then directed, it would have been superseded by (or merged in) the "final" judgments nisi entered in this case on March 4, 1988. This contention apparently is based on *Ross* v. *Ross*, 385 Mass. 30, 40 (1982). There is no necessity of discussing whether this contention is warranted for our remand in part D of the principal opinion leaves this to be dealt with as part of the remand to the judge for consideration of the subject of interim alimony.

### A. 4. *The Medical Condition of the Wife*

The wife contends (see her brief at 14-15, 39-44) that the probate judge improperly failed to rely on the evidence of the wife's medical expert and gave inadequate weight to the wife's and her expert's testimony about the risks to the wife's health from Raynaud's disease. The judge's findings show that the judge carefully observed the wife as she participated in the trial and gave full consideration to the issue of the wife's health. If the "possible gloomy [and speculative] prognosis of the doctor" turns out to be justified by later events, it will be open to the wife (if her assets are then inadequate) to apply for a modification allowing *alimony* sufficient to meet the situation. See *Gordon* v. *Gordon*, 26 Mass. App. Ct. 973, 975 (1988). See also *Bacon* v. *Bacon*, 26 Mass. App. Ct. 117, 122 (1988). The present case, however, even on the award under § 34 made by the judge, is not one where the parties will start out from the date of the judgments after rescript with the wife in "straitened circumstances." Cf. *LaValley* v. *LaValley*, 25 Mass. App. Ct. 918, 921 (1987).

### A. 5. *Alleged Deprivation of Access to Corporate Information*

The wife (her brief at 19 and her "impounded" brief) states that she was wrongfully denied access to her counsel with respect to, and excluded from, a deposition about various internal affairs of the corporation in which the husband was a large shareholder and by which he was employed. Counsel for that corporation filed a motion in behalf of the corporation for a protective order to prevent disclosure of highly confidential information which might affect adversely the corporation and its many shareholders on various grounds. Such a protective order in fact was entered. The deposition was an attempt by the wife's attorney to discover whether there was then any likelihood of some "leveraged takeover" or other structural change in the corporation which might greatly increase the value of the husband's shares. This matter was discussed at trial by the judge with the wife's counsel during the latter's cross-examination of the husband. On the basis of assurances then given, the inquiry was not pursued. ·

Over two years have now elapsed since the judgments nisi of March 4, 1988. No contention is now made that any leveraged takeover or other dramatic change increasing the value of the husband's shares in the corpo-

ration has taken place. This may indicate that, at the time of trial, no undisclosed, relevant negotiations were in progress. In any event, the wife has not established on the present record that she has suffered any actual harm from the protective order.

### A. 6. *Denial of Certain Motions*

The husband's motion dated May 25, 1989, to strike the wife's brief and appendix and to dismiss the appeal, and the motion (dated July 20, 1989) of the wife to strike portions of the husband's supplemental appendix and brief were referred by the single justice to the panel assigned to decide the appeal. The motions are severally denied.

### A. 7. *Conclusions as to Matters Discussed in this Appendix*

As stated at the end of this opinion, we conclude that no issue discussed in this appendix is of sufficient significance to require disturbing the probate judge's distribution of marital assets, except as to the remanded issues of interim alimony.